IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(Southern Division)


The Estate of Ryan LeRoux                    *
Paul LeRoux, *as Personal Representative*
2421 Boxwood Place                           *
Huntingtown, Maryland 20639
                                             *
and
                                             *
Rhonda LeRoux
2703 Amber Crest Road                        *
Hanover, Maryland 21076
                                             *
and
                                             *
Paul LeRoux
2421 Boxwood Place                           *
Huntingtown, Maryland 20639
                                             *        Civil Action No. 1: 22-cv-856
          Plaintiffs,
                                             *
     v.
                                             *
Montgomery County, Maryland
101 Monroe Street                            *
Rockville, Maryland 20850,
                                             *
     Served on:
          Marc Elrich, County Executive      *
          101 Monroe Street
          Rockville, Maryland 20850,         *

and                                          *

John Austin Cerny                            *
26309 Aiken Drive
Clarksburg, Maryland 20871-9634,             *

and                                          *

Brooks Michael Inman                         *
10728 Lamoka Lane
New Market, Maryland 21774-6884,             *

and                                        *

Romand Schmuck                             *
15 Degrange Street
Frederick, Maryland 21701-4864,           *

and                                        *

Sara Vaughan                              *
11804 Collins Drive
Germantown, Maryland 20879-4016,          *

        Defendants.                        *


## COMPLAINT AND REQUEST FOR JURY TRIAL

### INTRODUCTION



**Ex. 1 Ryan LeRoux at his high school graduation in 2017**

1.      Today Ryan Nicholas LeRoux should be alive.

2.      He is dead because instead of helping a young African-American male in the midst of a mental health crisis, four Montgomery County Police Department ("MCPD") officers shot 23 bullets at him.

3.      On the night of July 16, 2021, MCPD knew that Ryan needed help—not bullets. Two McDonald's workers called MCPD's 911 line at 9:12 p.m. because they witnessed Ryan's strange behavior. He was holding up the drive-thru lane by sitting in his car. The McDonald's employees informed the 911 dispatcher that no one was "in danger." They reported that no weapons were involved. They described Ryan as "acting crazy" because he would not move out of the drive-thru lane, had on headphones, and had not paid for his food.

4.      For such a 911 report, MCPD took over an hour to respond to McDonald's.

5.      Instead of sending a crisis intervention team or crisis negotiator to resolve the situation at McDonald's, MCPD sent Defendant Officer Brooks Inman.

6.      When Officer Inman arrived at 10:28 p.m., he saw Ryan reclined in the driver's seat and on his phone.



**Ex. 2 Ryan LeRoux with cell phone in hand—not a gun—with seat reclined, when Defendant Inman approached.**

7.      Within 18 seconds of his arrival, Defendant Inman saw a gun on the passenger's seat. Defendant Inman escalated the crisis by pulling out his gun and aiming it directly at Ryan.

8.      Defendant Inman further escalated the crisis by yelling at Ryan, "Put your hands up!"

9.      Confronted with this hostile escalation, Ryan did not respond in kind. Rather, he simply looked back at Defendant Inman, remained reclined in his seat, and stayed on his phone. Ryan did not pick up a gun.

10.      Defendant Inman continued to escalate the crisis by hollering at Ryan, "Keep your fucking hands up!" In response to Officer Inman's hostility, Ryan remained reclined in his seat and stayed on his phone. He did not pick up a gun.

11.      For approximately three minutes, Defendant Inman intermittently barked orders at Ryan, updated other MCPD officers over his radio, and took cover away from Ryan's car.

12.     During this time, Ryan remained reclined in his seat, stayed on his phone, and did not pick up a gun.

13.     Seeing Ryan's behavior, Defendant Inman never requested a crisis intervention team or a crisis negotiator.

14.     By 10:34 p.m., Defendant Officer Sara Vaughan arrived at McDonald's, took cover behind a sport utility vehicle ("SUV") and immediately escalated the crisis by drawing her gun.

15.     Around 10:36 p.m., Defendant Officer John Cerny arrived at McDonald's. He escalated the crisis by grabbing his rifle from his trunk and aiming it at Ryan.


**Ex. 3 Defendant Cerny with rifle and Defendant Vaughan with pistol**

16.     At 10:38 p.m., Defendant Officer Romand "Brian" Schmuck arrived. He escalated the crisis by deploying a shield and standing behind Ryan's SUV with his gun drawn.



**Ex. 4 Defendant Schmuck with his shield**

17.     At 10:49 p.m.—21 minutes after Defendant Inman's initial contact with a "crazy" Ryan—Capt. Brian Brian Dillman finally radioed to MCPD dispatch, "can you see if you have any crisis negotiators working and to have one or two respond here to the McDonald's please?"

18.     At 10:53 p.m., MCPD radio informed that a crisis negotiator was inbound to McDonald's.

19.     From 10:28 p.m. to 11:02 p.m., MCPD sent no less than 17 officers to McDonald's. None of the officers were crisis negotiators or part of a crisis intervention team.[1]

20.     MCPD also failed to timely call Emergency Medical Services ("EMS"), so that EMS could stage a proper response for someone in a mental health crisis.

21.     During this 34-minute time period, these 17 officers had Ryan completely trapped on all sides.

---

[1] None of the officers were African American.



**Ex. 5 Defendant Inman at the trunk of the car with gun drawn and Ryan surrounded**

22.     At 11:02, Defendants Cerny and Vaughan radioed that they saw Ryan raise out of his seat with a gun in his hand. All four Officer Defendants shot at Ryan 23 times and killed him.

23.     When MCPD searched Ryan's car, they found several items, including a gun.

24.     They also found a prescription for Risperidone, which is an anti-psychotic medication and consistent with Ryan being in the midst of a mental health crisis on July 16, 2021.



**Ex. 6 Risperidone prescription bottle found in Ryan's car**

25.     Seconds before the Officer Defendants killed Ryan, MCPD's crisis negotiator radioed that he was "about two minutes out."

26.     Today Ryan Nicholas LeRoux should be alive.

### JURISDICTION AND VENUE

27.     This Court has jurisdiction over the claims brought under the Americans with Disabilities Act ("ADA"), and Section 504 of the Rehabilitation Act ("Section 504") pursuant to 28 U.S.C. § 1331. It has jurisdiction over the remaining State law claims pursuant to 28 U.S.C. § 1367.

28.     Plaintiffs have complied with the Local Government Tort Claims Act, Md. Code Ann. Cts. & Jud. Proc. §§ 5-301, et seq. by giving notice of their claims within one year of the occurrence of Ryan's death and timely filing this lawsuit.

29.     Venue is appropriate under 28 U.S.C. § 1391 in that the events giving rise to this lawsuit occurred in Maryland and all Defendants are located in Maryland.

## PARTIES

30.     The Estate of Ryan LeRoux was opened in Anne Arundel County, Maryland on August 20, 2021. Paul LeRoux is the personal representative of the Estate.

31.     Paul LeRoux is a resident of Huntingwood, Maryland. He is the father of Ryan Nicholas LeRoux and sues individually and as the representative of the Estate of Ryan LeRoux.

32.     Rhonda LeRoux is a resident of Hanover, Maryland. She is the mother of Ryan Nicholas LeRoux. She sues individually.

33.     Brooks Inman, Sara Vaughn, John Cerny, and Romand Schmuck (the "Officer Defendants") are MCPD police officers. At all times relevant to this action, the officers were acting under color of law and within the scope of their employment as agents for Montgomery County, Maryland.

34.     Montgomery County is a county in the state of Maryland.

## FACTUAL ALLEGATIONS

### Ryan's Mental Health

35.     Ryan struggled with mental illness much of his life. He was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and depression at age 8. He had a prescription for Risperidone, which is an anti-psychotic medication. As an adolescent, he spent time undergoing inpatient treatment at Shepherd Pratt Psychiatric Hospital.

36.     He was involuntarily committed to an inpatient treatment center at Northwest Hospital in October 2020 after state police found him walking nude by the side of the road during a psychotic episode. He claimed that people were chasing him.

37.     During his stay at the treatment center, Ryan continued to exhibit psychosis with bizarre behaviors. He was suspicious of healthcare providers and thought they were trying to kill him. When Ryan's parents contacted him, he was convinced that his mother and father were imposters and not his real parents. He told his attending physician that someone was following him and that he removed his clothes to get rid of a tracking device. Throughout his stay, he continued to insist that people were chasing him the night he was picked up.

38.     Ryan was prescribed anti-psychotic medication before he was discharged.

39.     Because he was distraught from the death of his grandmother and the combined loss of his job, girlfriend, and home, Ryan's depression and mental instability were exacerbated on the night of July 16, 2021. He was living in his car at the time.

### MCPD Failed to Accommodate Ryan's Mental Health

40.     At 9:15 p.m., MCPD received a non-urgent call from McDonald's employees about a customer who would not leave the drive-thru lane. At this time, Ryan was sitting peacefully in his car.

41.     Ryan continued to sit peacefully in his car for the next hour, when MCPD officers arrived at the McDonald's.

42.     When MCPD officers eventually responded they found Ryan reclined in the driver's seat of his SUV, wearing large over-the-ear headphones, and holding his cell phone in his right hand.

43.     At around 10:28 p.m., Defendant Inman approached the SUV and noticed a gun in the front passenger seat. Defendant Inman retreated and called for backup.

44.     According to his father, Ryan recently had legally purchased the handgun for personal protection.

45.     Defendant Inman noted that Ryan was reclined in his seat and had both his hands on his phone, nowhere near the gun in the front passenger seat. Defendant Inman ordered Ryan to "keep [his] fucking hands up." Moments later, after trying to open the front passenger door, the Defendant Inman contradicted his initial order and told Ryan to unlock the passenger door with his left hand.

46.     Ryan did not respond to the Defendant Inman's commands, but continued to hold his phone with both hands.

47.     Within minutes, at least 17 other police officer arrived, surrounding Ryan. Police cars and SUVs pulled up to the drive-thru and boxed in Ryan's small SUV. MCPD officers secured the area and evacuated the McDonald's.

48.     Officers also deployed "stop strips" in front of and behind Ryan's car to prevent him from driving off. The officers had contained the situation—Ryan was not going anywhere.

49.     Officers surrounded Ryan's car and pointed their guns at him from behind the cover of their vehicles. Defendant Cerny wielded a military-style assault rifle. Using megaphones, the officers repeatedly told Ryan to put his hands where they could see them. It is unclear if Ryan could hear them through his headphones and mental health crisis.

50.     By 10:53 p.m., realizing that they were dealing with a fragile mental health situation, Officer Capt. Brian Dillman, who was the senior officer on scene, requested a trained crisis negotiator and confirmed that one was on the way.

51.     During the 30-plus-minute interaction with Ryan, the officers communicated with him directly only twice. At 10:51 p.m. a dispatcher from Montgomery County Emergency Communications spoke with Ryan for five minutes. She asked him to put his hands up and put them out the window. Ryan responded that he had already done so.

52.     Another officer on the scene spoke with Ryan for about one minute at 10:58 p.m. He called Ryan's cell phone and asked him what was going on before they were disconnected.

53.     Even though they knew that a trained crisis negotiator was on the way, the Officer Defendants began to formulate their own plan to pull Ryan out of the car. The bodycam footage reveals them discussing a plan to break the front passenger window, grab the gun, and then pull him through the open window.

54.     At 11:02 p.m., before the Officer Defendants could execute this poorly conceived plan, Ryan sat up from his reclining position in the driver's seat. Defendant Vaughan exclaimed "he's up." Defendant Cerny relayed he is "eyeing the gun."

55.     Within seconds of Ryan sitting up in the front seat, the Officer Defendants opened fire on him. The evidence is inconclusive as to whether Ryan pointed a gun at the police when they shot him. There is conclusive evidence that only four out of the 17 officers present shot at Ryan.

56.     It is unclear if Ryan was even holding the gun when the Officer Defendants shot him. The bodycam footage possibly depicts Ryan raising his right arm. Notably, Ryan was left-handed, so it makes little sense that he would wield a gun with his right hand. The Officer Defendants never saw Ryan pick up the gun or put down his cell phone.

57.     The Officer Defendants fired 23 shots at Ryan.

58.     The Officer Defendants unnecessarily killed Ryan LeRoux the night of July 16, 2021. His actions were indicative of a mental health crisis.

59.     Defendant Montgomery County violated Ryan's right to reasonable modifications of a police investigation at a time when MCPD knew Ryan was suffering from a mental health

crisis. The request for the dispatch of a crisis negotiator or a crisis intervention team to the scene is evidence that MCPD knew that Ryan was undergoing a mental health crisis.

60.     Even if the Defendants did not know the specifics of Ryan's mental health situation, they knew that he had been sitting, non-responsive, in the drive-thru lane of a McDonald's for more than 90 minutes when the police shot him to death in what MCPD described as a "show of force."

### MCPD has a Pattern and Practice of Using Deadly Force in Encounters with People with Mental Health Disabilities and in Mental Health Crises.

61.     MCPD officers routinely use excessive and deadly force in encounters with individuals experiencing mental health and emotional crises.

62.     On the afternoon of May 7, 2020, an MCPD officer responded to a 911 call about a man's neighbor throwing a rock through his window. Finan Berhe was acting erratically and appeared to be suffering a mental health crisis. Less than two minutes after the MCPD officer arrived, he had shot Mr. Berhe dead.

63.     In 2018, an MCPD officer shot and killed a man named Robert White, who had ADHD, because he reached into his pocket. In that case, the MCPD officer was not responding to a call—he merely encountered Mr. White walking down the street.

64.     More generally, a review by the Montgomery City Council's Office of Legislative Oversight revealed that suspected mental illness was a key risk factor for uses of force by MCPD officers.

65.     The Officer Defendants' actions were performed pursuant to this de facto custom within MCPD of using excessive force against people with mental health disabilities and people in mental and emotional crisis.

**MCPD Failed to Train Its Officers to Respond Appropriately and Non-Violently to Individuals with Mental Illness or in Mental or Emotional Crisis.**

66.     Fatal shootings such as these have occurred notwithstanding the putative availability of crisis intervention training on how to respond to individuals suffering from mental health disabilities or experiencing mental health and emotional crises.

67.     MCPD's policies regarding interacting with people in crisis are inadequate, giving officers few tools for managing such situations. For example, the policy tells officers to request a crisis intervention team officer or Mobile Crisis Team but provides no guidance on how to de-escalate, either generally or by example. Practically the only advice to the responding officer is to call a crisis intervention team officer and sit tight. *See* FC 921, "Emergency Evaluation of Mentally Disordered Individuals," (II)(D) – (F). In this case, the responding officers' failure to follow even MCPD's minimal instructions suggests that they did not receive adequate training on those policies that do exist.

68.     MCPD leadership itself has recognized this training gap. Less than two weeks after MCPD officers killed Ryan, County Executive Marc Elrich announced a partnership with Effective Law Enforcement for All ("ELE4A") in response to the incident. ELE4A is in the process of conducting reviews of Ryan's shooting and similar incidents to, in Mr. Elrich's words, "provide additional recommendations for . . . trainings needed to avoid similar situations." *See* Statement from Montgomery County Executive Marc Elrich on the Video from the Officer-Involved Shooting in Gaithersburg, July 27, 2021.

69.     Police officers are expected to show restraint when faced with a person experiencing a mental health crisis because that person may misinterpret instructions and, when confronted with demands, may believe themselves to be under attack and that they need to defend themselves.

14

70.     MCPD's enactment of these policies and provision of training to some officers demonstrates that MCPD knows its officers need instruction to safely and successfully respond to encounters with people in crisis. Indeed, one in five calls to MCPD are for mental health distress. Nevertheless, many MCPD officers do not receive crisis intervention training.

71.     Despite the fact that MCPD officers frequently encounter individuals experiencing mental or emotional illness, on information and belief, none of the Officer Defendants had received crisis intervention training. MCPD's failure to train these officers caused Mr. LeRoux's death.

## CAUSES OF ACTION

### COUNT I
### Title II of the Americans with Disabilities Act – Survival Action
### (Estate of Ryan Nicholas LeRoux against Montgomery County, Maryland)

72.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

73.     Ryan LeRoux was a qualified individual with a disability protected by the ADA, *see* 42 U.S.C. §§ 12102, 12131(2). Mr. LeRoux suffered from ADHD, depression, and schizophrenia, which are disabilities within the meaning of the ADA.

74.     Title II of the ADA guarantees qualified individuals with disabilities an equal opportunity to access the benefits of the services, programs, or activities of a public entity. 42 U.S.C. § 12132.

75.     MCPD is a local government agency and therefore a public entity subject to Title II of the ADA. Montgomery County operates MCPD. Under the ADA, public entities are responsible for the discriminatory actions of their employees.

76.     Police work involving the public, including stops, seizures, investigations, and arrests, are programs, services, and/or activities within the meaning of Title II.

77.     Discrimination under Title II of the ADA includes the failure to make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability. 28 C.F.R. § 35.130(b)(7)(i).

78.     MCPD is obligated to evaluate its current services, policies, practices, and their effects and make any necessary modifications of those services, policies, and practices to achieve compliance with the ADA.

79.     Defendant Montgomery County failed to reasonably modify its approach to the investigation and seizure of Ryan at a time when it knew or should have known that Ryan was suffering from a mental health disability.

80.     Reasonable modifications under the circumstances would have included waiting for the trained crisis intervention assistance that had already been requested instead of hastily engaging a man in crisis and escalating a crisis into a catastrophe. Defendant Montgomery County's failure to provide Mr. LeRoux with reasonable modifications violated Title II of the ADA.

81.     Under Title II, a public entity may not "[a]fford a qualified individual with a disability an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others" or "[p]rovide a qualified individual with a disability with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others." 28 C.F.R. § 35.130(b)(1)(ii)–(iii).

82.     Because Defendant Montgomery County had ample reason to believe that Ryan was in a mental health crisis, holding Ryan at gunpoint for over 30 minutes and then using lethal force amounts to discrimination against Ryan on the basis of disability.

83.     To ensure compliance with the ADA, public entities, including police departments, must provide training adequate to ensure that individuals with disabilities are provided services in a manner that complies with the ADA. The MCPD fails to provide adequate training to its officers on its written policies, manuals, and orders concerning how to interact with and respond to individuals suffering from mental health disabilities and experiencing mental health or emotional crises. The MCPD also fails to provide crisis intervention training to all of its officers, even though its officers are all likely to encounter situations where such skills are essential.

84.     Montgomery County's violation of Title II of the ADA proximately caused the death of Ryan LeRoux.

85.     Montgomery County's violations of the ADA caused Ryan LeRoux to sustain severe, conscious pain and suffering between the time of injury and death.

**COUNT II**
**Section 504 of the Rehabilitation Act – Survival Action**
**(Estate of Ryan Nicholas LeRoux against Montgomery County, Maryland)**

86.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

87.     Ryan was a qualified individual with a disability protected by Section 504 of the Rehabilitation Act. *See* 29 U.S.C. § 794(a); 45 C.F.R. § 84.3(j).

88.     The Rehabilitation Act mandates that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in,

be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

89.    Defendant Montgomery County, including its police department, receive federal financial assistance as that term is used in Section 504, and is therefore covered by the Rehabilitation Act. Montgomery County and the MCPD are responsible under Section 504 for the discriminatory acts of their employees.

90.    Police work involving the public, including stops, seizures, investigations, and arrests, are programs, services, and/or activities within the meaning of Section 504.

91.    To ensure compliance with Section 504, local and state governments must provide adequate training to their employees to ensure that individuals with disabilities are provided services in a manner that complies with Section 504. MCPD fails to provide adequate training to its officers on its written policies, manuals, and orders concerning how to interact with and respond to individuals suffering from mental health disabilities and experiencing mental health and emotional crises. MCPD also fails to provide crisis intervention training to all of its officers, even though its officers are all likely to encounter situations where such skills are essential.

92.    The failure of MCPD to properly train MCPD officers to respond to individuals with mental health disabilities violates Section 504.

93.    The Officer Defendants failed to provide Ryan with reasonable modifications of his seizure and investigation at a time when they knew that Ryan was suffering from a mental health disability.

94.    Reasonable modifications under the circumstances would have included waiting for the trained crisis intervention assistance that had already been requested instead of hastily

engaging a man in crisis and escalating that crisis into a catastrophe. Defendant Montgomery County's failure to provide Ryan with reasonable modifications violated Section 504.

95.     Discrimination includes failing to "[a]fford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded others," or providing qualified handicapped persons with "an aid, benefit, or service that is not as effective as that provided to others."  45 C.F.R. § 84.4(b)(1)(ii)–(iii); *see* 45 C.F.R. § 84.52(a)(2)-(3).

96.     Because Defendant Montgomery County had ample reason to believe that Ryan was in a mental health crisis, holding Ryan at gunpoint for over 30 minutes and then using lethal force amounts to discrimination against Ryan on the basis of disability.

97.     Defendant Montgomery County's violation of Section 504 proximately caused Ryan's death.

98.     Defendant Montgomery County's violations of Section 504 caused Ryan to sustain severe conscious pain and suffering between the time of injury and death.


**COUNT III**
**Negligence – Survival Action**
**(Estate of Ryan LeRoux against all Defendants)**

99.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

100.    The Officer Defendants failed to follow MCPD protocols concerning responding to individuals in mental health crises. These protocols instruct MCPD officers to wait for the arrival of a crisis intervention team officer or mobile crisis team.

101.     Rather than acting as a reasonable officer in his circumstances would have and waiting for the crisis intervention team officers who were already on their way, the Officer Defendants breached their duties as police officers and escalated the encounter with Ryan by utilizing deadly force.

102.     The Defendants knew, had reason to know, or should have known of the risks of escalating an encounter with someone in mental distress.

103.     The Defendants' negligence proximately caused Ryan's death, and his death was a foreseeable result of such negligence.

104.     As a direct and proximate result of the conduct of the Defendants, Ryan endured severe conscious pain and suffering between the time of injury and death.

### COUNT IV
### Gross Negligence – Survival Action
### (Estate of Ryan LeRoux Against All Defendants)

105.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

106.     The Officer Defendants failed to follow MCPD protocols concerning responding to individuals in mental health crises. These protocols instruct MCPD officers to wait for the arrival of a crisis intervention team officer or mobile crisis team.

107.     Rather than acting as a reasonable officer in his circumstances would have and waiting for the crisis intervention team officers who were already on their way, the Officer Defendants breached their duties as police officers and escalated the encounter with Ryan by utilizing deadly force.

108.     Defendants knew, had reason to know, or should have known of the risks of engaging in such conduct with someone in mental distress.

109.     The gross negligence of the Defendants proximately caused the death of Ryan. As a direct and proximate result of the conduct of the Defendants, Ryan endured severe conscious pain and suffering between the time of injury and death.

## COUNT V
### Wrongful Death
### (Paul LeRoux and Rhonda LeRoux against All Defendants)

110.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as if restated fully herein.

111.     Paul and Rhonda LeRoux are the parents of Ryan LeRoux. At the time of his death, decedent was an unmarried resident of Montgomery County with no children. Both individual Plaintiffs are primary beneficiaries in this action pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-904. No other individuals are entitled by law to recover damages for Ryan's death.

112.     By the wrongful acts set out above, Defendants caused Ryan's death.

113.     As a direct and proximate result of Defendants' wrongful acts in causing the death of Ryan, Paul and Rhonda LeRoux sustained mental anguish, emotional pain and suffering, loss of society, loss of companionship, and loss of comfort.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court:

a.     Enter judgment in Plaintiffs' favor and against Defendants;

b.     Award compensatory damages to Plaintiffs jointly and severally against all Defendants;

c.     Award punitive damages to all Plaintiffs against the Officer Defendants;

d.      Award the Estate of Ryan LeRoux attorneys' fees and costs pursuant to 42 U.S.C. §§ 1988 and 12205; and

e.      Issue any and all other further relief as this Court may deem just and proper.

Dated: April 8, 2022                              Respectfully submitted,

                                                  _____
                                                  Kobie A. Flowers (Bar No. 16511)
                                                  kflowers@browngold.com
                                                  Joseph B. Espo (Bar No. 07490)
                                                  jbe@browngold.com
                                                  Brown, Goldstein & Levy, LLP
                                                  120 E. Baltimore Street, Suite 1700
                                                  Baltimore, Maryland 21201
                                                  Tel: (410) 962-1030
                                                  Fax: (410) 385-0869

                                                  *Attorneys for Plaintiffs*


## DEMAND FOR JURY TRIAL

Plaintiffs hereby request a trial by jury.

                                                  _____
                                                  Kobie A. Flowers (Bar No. 16511)
                                                  kflowers@browngold.com
                                                  Joseph B. Espo (Bar No. 07490)
                                                  jbe@browngold.com
                                                  Brown, Goldstein & Levy, LLP
                                                  120 E. Baltimore Street, Suite 1700
                                                  Baltimore, Maryland 21201
                                                  Tel: (410) 962-1030
                                                  Fax: (410) 385-0869

                                                  *Attorneys for Plaintiffs*